# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID B. ROSSMAN, | No. 4:21-CV-00703 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| PRIMECARE MEDICAL INC., *et al*., | |
| Defendants. | |

## MEMORANDUM OPINION

### APRIL 5, 2022

David Rossman arrived at Centre County Correctional Facility on October 15, 2021, five days removed from a car accident that required emergency surgery to fuse his fractured C6 and C7 vertebrae.[1] Severe as this injury was, he was up and walking by October 13, and the hospital approved his discharge into police custody two days later.[2] But he was not yet out of the woods: just five days after he entered the Correctional Facility, he left in an ambulance.[3] The screw that held his fractured vertebrae together had come loose, rendering the 22-year-old a tetraplegic.[4]

The Defendants, counts, and allegations in this suit are numerous. Today's motion, however, is narrow. It concerns only whether Centre County and

---

[1]   Doc. 1 ¶ 43.
[2]   *Id.* ¶ 43.
[3]   *Id.* ¶ 167.
[4]   *Id.* ¶ 174.

Corrections Officers Waite and Zettle are proper defendants. Because I find that Rossman has alleged facts that, if true, would allow this Court to find these Defendants liable, their motion to dismiss is denied.

## I.   BACKGROUND

Given that this motion to dismiss comes from a narrow band of Defendants, a more limited treatment of the facts is appropriate. For the County, Waite, and Zettle, the story picks up after Rossman's accident, surgery, and discharge into policy custody, when he could not post $75,000 in bail before Magisterial District Judge Gillette-Walker, resulting in his commitment to the Centre County Correctional Facility.[5]

Rossman arrived at the Correctional Facility in a cervical thoracic orthosis brace with explicit instructions from his treating physician that his brace should be worn whenever he was out of bed, save for showers.[6] He was greeted by Corrections Officer Zettle, who was given a copy of his hospital discharge papers.[7] In Rossman's telling, his appearance and his discharge papers made Zettle aware of his serious medical needs, which he knew the facility could not meet.[8] But Zettle—who Rossman claims had the authority to deny his detainment in favor of a medically appropriate facility, or contact a superior who could do the same—took no such

---

[5]   *Id.* ¶¶ 45, 47, 50.
[6]   *Id.* ¶ 51.
[7]   *Id.* ¶ 56.
[8]   *Id.* ¶¶ 57–60.

steps.[9] Instead, he placed Rossman in a holding cell for two hours until a series of PrimeCare Medical nurses completed his intake process.[10]

Ultimately, PrimeCare Medical staff approved Rossman's move to a single cell, rather than placing him in the Correctional Facility's health services room.[11] In the days that followed, Rossman alleges to have received care—from nurses and corrections officers alike—that could at best be described as unintelligent. He reports that the nurses checked on him no more than once or twice a day.[12] And in his view, these were little more than perfunctory; the nurses simply took his temperature and asked him COVID-19 related questions, despite his escalating complaints of numbness and pain.[13] Worse yet, each time the nurses took his temperature through the slot in the door they required that he get up out of bed unassisted.[14] As he could not put the brace on himself and his requests for assistance were denied, this meant that he was repeatedly asked to move around without his brace, even though the nurses knew that his doctor had ordered that he wear it whenever he was out of bed.[15]

This same ham-handed treatment is alleged to have occurred among the corrections officers. Rossman's complaint details how a day after he arrived, he was

---

[9]   *Id.*
[10]  *See generally id.* ¶¶ 61–75.
[11]  *Id.* ¶ 82.
[12]  Doc. 40 at 3; *see also* Doc. 1 ¶ 128 (noting that he was not seen by PrimeCare Medical staff the day before he was sent to the hospital).
[13]  Doc. 40 at 3; *see* Doc. 1 ¶¶ 88, 107, 117–119, 125–126.
[14]  *See* Doc. 1 ¶¶ 81, 86.
[15]  *Id.* ¶¶ 87, 106.

forced to transfer cells, without his brace.[16] And it further delves into how, a day later, a corrections officer forced him to walk from his cell to the shower, again without his brace, though he had asked for assistance putting it on.[17]

As Rossman tells it, his mistreatment came to a head on October 20, 2021, when he heard a crack in his neck and back area.[18] In excruciating pain and unable to reach the intercom to call for assistance, Rossman cried for help for several minutes.[19] In the end, Corrections Officer Waite was alerted and asked, by intercom, what was wrong.[20] Rossman told him what had happened, and Waite radioed the nurses station.[21] Yet no one responded to the scene for another two hours, all the while Rossman cried out in agony.[22]

Eventually, Waite and a nurse arrived with a wheelchair.[23] But despite Rossman presenting clear signs of having aggravated his serious spinal injury, Waite allegedly refused to bring the wheelchair into his cell, telling Rossman instead to get up and walk.[24] Worse still, after Rossman made his way to the chair and sat, Waite proceeded to send him back into the cell to put his shoes on.[25] During this second

---

[16]   *Id.* ¶¶ 96–97.
[17]   *Id.* ¶¶ 110–112.
[18]   *Id.* ¶ 134.
[19]   *Id.*
[20]   *Id.* ¶¶ 135–136.
[21]   *Id.*
[22]   *Id.* ¶¶ 137–138, 148.
[23]   *Id.* ¶¶ 145, 149.
[24]   *Id.*
[25]   *Id.* ¶ 150.

excursion, Rossman claims that he lost feeling his leg.[26] But even after he told Waite and the nurse about the worsening of his already precarious condition, they proceeded to wheel him to the nurse's area.[27] From there, the nurse and another member of the medical staff had Rossman hoist himself up onto the x-ray table and contort his legs from side-to-side as the screening was performed.[28] The scan showed that the surgically placed screws had detached, and the nurse was instructed to call an ambulance.[29] But notwithstanding this result showing that the screws that once held his fractured vertebrae together were now floating about in his spinal column, Rossman was then helped down from the x-ray table and back into the wheelchair before being wheeled into the intake area.[30]

The ambulance took Rossman to UPMC Altoona, however, the emergency room staff soon determined that he needed critical care and arranged for a life-flight to UPMC Presbyterian in Pittsburgh.[31] In spite of these last-ditch efforts, the then-22-year-old Rossman was left paralyzed from his upper torso down.[32]

---

[26] *Id.* ¶¶ 151–152.
[27] *Id.*
[28] *Id.* ¶¶ 156, 158–159.
[29] *Id.* ¶¶ 160–161.
[30] *Id.*
[31] *Id.* ¶¶ 167–170.
[32] *Id.* ¶¶ 1, 174.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." Following the landmark decisions *Bell Atl. Corp. v. Twombly*[33] and *Ashcroft v. Iqbal*,[34] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[35] In its assessment, the Court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[36] Still, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[37] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[38]

## III.    ANALYSIS

Each of the challenged counts in this suit are brought under 42 U.S.C. § 1983.[39] The statute "does not, by its own terms, create substantive rights; it

---

[33]   550 U.S. 544 (2007).

[34]   556 U.S. 662 (2009).

[35]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[36]   *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[37]   *Iqbal*, 556 U.S. at 678; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

[38]   *Iqbal*, 556 U.S. at 678.

[39]   42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws."[40] As a result, "to establish a section 1983 claim, a plaintiff 'must demonstrate a violation of a right secured by the Constitution and the laws of the United States and that the alleged deprivation was committed by a person acting under color of state law.'"[41]

Rossman's Counts center on the deprivation of his right to adequate medical care under the Fourteenth Amendment. This right, and the variations on it that Rossman has alleged, are well-established.[42] All that remains is an assessment of whether the allegations, if taken to be true, would show that the respective Defendants indeed violated those rights. Each are addressed in turn.

## A.     The Corrections Officers' Liability

Rossman's claims against the Corrections Officers in this suit come in two varieties. First, in Counts VIII and IX, Rossman alleges that Corrections Officer

---

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress").

[40] *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) and *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995), *cert denied*, 516 U.S. 858 (1995)).

[41] *Id.* (quoting *Mark*, 51 F.3d at 1141) (internal alteration omitted).

[42] *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581–82  (3d Cir. 2003) ("the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner,' . . . [and] [i]n Estelle, the Supreme Court held that the Eighth Amendment proscribes deliberate indifference to prisoners' serious medical needs"); *Kitchen v. Clinton Cnty.*, 2020 WL 3052864, at *4 (M.D. Pa. June 8, 2020) (Mariani, J.).

Waite and all individual Corrections Officers Defendants—which includes Zettle—denied him adequate medical care. Second, in Count X, he alleges that each named Defendants in the suit—and thus, Waite and Zettle—should be held liable for their failure to intervene.

A corrections officer violates a detainee's right to adequate medical care under the Fourteenth Amendment "when they act deliberately indifferent to a [detainee's] serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'"[43] As a result, for Count VIII and IX to advance, Rossman must allege facts showing he had "a serious medical need" and that the Corrections Officers "acts or omissions . . . indicate deliberate indifference to that need."[44] But it is not enough for Rossman to show that the Corrections Officers "fail[ed] to respond to [his] complaints."[45] He must instead show that they had "reason to believe, or actual knowledge, that prison medical staff [was] mistreating, or not treating [him] . . . ."[46]

At the same time, the corrections officers may be found liable for failure to intervene under Count X if Rossman proves "(1) an underlying constitutional violation; (2) a duty to intervene; and (3) a realistic opportunity to intervene."[47] A

---

[43] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

[44] *Natale*, 318 F.3d at 582 (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1997)).

[45] *Kitchen*, 2020 WL 3052846, at *6 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[46] *Id.* (citing *Spurill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

[47] *Id.* (citing *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002)).

duty to intervene stems from the constitutional violation "[taking] place in [the corrections officer's] presence or with his or her knowledge."[48]

### 1.    Corrections Officer Zettle

The deprivation of adequate medical care and failure to intervene claims against Zettle center on his role in the intake process.[49] Boiled down, Rossman alleges that when he arrived at the Correctional Facility in a brace, with hospital papers flagging his serious medical condition, Zettle was aware that he should be transferred to a different, medically appropriate facility and he had the power bring about that result. However, reading Rossman's complaint in the most favorable light, it must also be said that Zettle—like all other named individuals—has been accused of failing to help Rossman into his brace, which he was known to both need and be unable to put on himself.[50]

Based on the intake allegations, Rossman has sufficiently pleaded that Zettle denied him access to adequate medical care. The scope of Zettle's power and the Correctional Facility's ability—if staff followed appropriate procedure—to provide care for someone who arrived in his condition may well end up in dispute. But those issues are more appropriately resolved after discovery. The same can be said of

---

[48] *Smith*, 293 F.3d at 650.
[49] Doc. 1 ¶¶ 51–60.
[50] *Id.* ¶¶ 276–282.

Rossman's broad allegation that each of the named individuals, including Zettle, failed to intervene.

### 2.    Corrections Officer Waite

Aside from the just discussed claim against all named individuals for failure to intervene, Rossman's allegations against Waite focus on the events of October 20, 2021.[51] Rossman's Complaint first details how Waite responded to his initial cries for help and called the nursing staff, but ultimately failed to intervene during the two-hour period in which Rossman waited in agony.[52] It then highlights how when Waite and a nurse arrived, rather than bring the wheelchair to him. or avoid moving a person with a spinal injury to begin with, Waite required Rossman to walk to the wheelchair himself, only to then ask that Rossman repeat the process to put on his shoes.[53] Finally, the Complaint describes how even after Rossman told Waite and the nurse that he had lost feeling in his leg, which Rossman alleges should have set off warning bells to anyone with knowledge of first aid, Waite proceeded to wheel him to the room where he had an x-ray.[54]

Waite's potential liability is complicated by the general rule in this circuit that "absent a reason to believe (or actual knowledge) that prison doctors or their

---

[51]   *Id.* ¶¶ 256–263. As the Defendants highlight in their brief, Rossman likely erroneously alleges that Waite was also present at Rossman's intaking. Doc. 37 at 9; *see* Doc. 1 ¶¶ 248–253. If this is indeed an error, it ought to be cleaned up.

[52]   Doc. 1 ¶¶ 136–137, 147.

[53]   *Id.* ¶¶ 148–150, 259

[54]   *Id.* ¶¶ 151–156, 259.

assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the . . . scienter requirement of deliberate indifference."[55] But dismissal under this general rule would be inappropriate here. To start, courts have emphasized that this rule applies only when the inmate is "under continuing medical care"—which is not satisfied by the once- or twice-a-day visits here.[56] But beyond that, Rossman's allegations demonstrate that two hours elapsed between Waite's initial call to the nurses' station and their arrival. Setting aside even the allegations about his conduct when he arrived at the cell, this is enough to suggest that Waite had a reason to believe that Rossman was not being treated—particularly in light of caselaw finding that "even when an inmate is under the care of prison medical staff, his condition might be 'so dire and obvious that a non-medical prison official's failure to summon immediate medical attention amounts to deliberate indifference.'"[57] And this evidence, alongside Rossman's broad allegation about each of the named individual's failure to ensure that he was properly braced, advances his failure to intervene claim past this motion to dismiss.

---

[55]   *Spruill*, 372 F.3d at 236.

[56]   *See Adami v. Cnty. of Bucks*, 2020 WL 5849339, at *4 (E.D. Pa. Oct. 1, 2020) (finding that an inmate that was housed with the general prison population that received visits from three nurses throughout an evening was not under "continuing medical care").

[57]   *Dinsmore v. Cnty. of Butler*, 2017 WL 413072, at *3 (W.D. Pa. Jan. 31, 2017) (quoting *Spruill*, 372 F.3d at 237) (internal alterations omitted).

### 3.    The Corrections Officers' Claim to Qualified Immunity

Waite and Zettle also argue that even if Rossman has adequately alleged an underlying constitutional violation, the counts should still be dismissed because they are entitled to qualified immunity. The primary basis for their claim is that Rossman has not alleged facts showing that either of them knew their conduct was unlawful. But Waite and Zettle's subjective knowledge is irrelevant.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[58] Embedded in this statement is a two-part assessment: "(1) 'whether the facts that the plaintiff has alleged make out a violation of a constitutional right,' and (2) 'whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.'"[59] As I have found that the former has been established here, all that remains is the latter, which requires that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[60] Put simply, a detainee's right to adequate medical care is clearly established.[61] And the Defendants have failed to show that an objectively

---

[58]  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[59]  *Adami*, 2020 WL 5849339, at *3 (quoting *Perason*, 555 at 232).

[60]  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[61]  *See e.g.*, *Adami*, 2020 WL 5849339, at *3.

reasonable corrections officer wouldn't have understood the violative nature of admitting a person five days removed from a traumatic back injury into a non-medically specialized portion of the Facility or of making an inmate wait two hours to receive assistance after his calls for help indicated that he had aggravated a serious spinal condition.

*       *       *

In sum, Rossman has pleaded facts that, if true, show that Waite and Zettle's conduct violated his constitutional rights. As neither of the Correction Officers have shown that their conduct is protected by qualified immunity, their motion to dismiss Counts VIII, IX, and X is denied.

### B.    Municipal Liability

In Count XII, Rossman alleges that Centre County is liable under 42 U.S.C. § 1983 for failing to establish policies that would ensure the proper care of individuals who have suffered spinal trauma.[62] The County's role is straight-forward: it oversees operations at the Centre County Correctional Facility, and it contracts with PrimeCare Medical to provide inmates medical care.[63]

It is elementary that municipalities "cannot be held liable for the constitutional violations of their employees based upon vicarious liability. Rather, for liability to attach . . . plaintiff[s] must allege that the violation . . . was caused by [the

---

[62]    Doc. 1 ¶¶ 294–295.
[63]    *Id.* ¶¶ 9–12.

municipality's] policy or custom . . . ."[64] The Third Circuit has detailed three scenarios through which policy- or custom-created municipal liability can arise:

> (1) where the appropriate officer has promulgated a generally applicable statement of policy for the municipality; (2) where no general rule has been announced, but the policymaker itself performs the act which violated federal law; and (3) where no policy exists and the policymaker has refused to act, even though the "need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."[65]

At this pre-discovery stage, Rossman's complaint embraces the third scenario. He contends that an adequate and effectively implemented policy would have differed on several fronts—and that Centre County's failure to establish or implement this sort of policy constituted reckless disregard for, or deliberate indifference to, his to his right to adequate medical care.

In Rossman's view, an adequate policy would have ensured:

- First, that "an individual with serious spinal trauma" would not have been "detained at [Centre County Correctional Facility], when it [was] clear that adequate medical care [could not] be provided";[66]

---

[64]   *Kitchen*, 2020 WL 3052846, at *4 (internal citation omitted).
[65]   *Id.* (quoting *Natale*, 518 F.3d at 584).
[66]   Doc. 1 ¶ 296(a).

- Second, that "staff [would be] properly trained to perform "medical evaluations, diagnosis, care, and treatment for individuals with spinal trauma";[67]

- Third, "that a new arrival with a serious medical condition . . . [would be] immediately evaluated and . . . a comprehensive plan to address the serious medical condition [would] be implemented";[68]

- Fourth, "that all hospital discharge instructions for an inmate/detainee [would be] reviewed, processed, and implemented immediately upon arrival";[69]

- Fifth, "that when an inmate/detainee arrives with a medically necessary device . . . all medical and non-medical personnel [would be] aware of the need for the device, and that instructions for the use of the device are implemented immediately";[70]

- Sixth, that the "immediate medical needs of any inmate or detainee who arrives with a spinal injury" would be addressed;[71] and

- Seventh, that the "immediate medical needs of any inmate or detainee who presents clear signs of having sustained a spinal injury at [Centre County Correctional Facility]" would be addressed.[72]

---

[67] *Id.* ¶ 296(b).
[68] *Id.* ¶ 296(c).
[69] *Id.* ¶ 296(d).
[70] *Id.* ¶ 296(e).
[71] *Id.* ¶ 296(f).
[72] *Id.* ¶ 296(g).

In response, Centre County contends that its decision to admit Rossman to the Correctional Facility was not improper and that Rossman has not shown that the County failed to establish policies or train its employees.[73] For the former, the County argues that Rossman has not explained how the Correctional Facility "could turn away a defendant lawfully remanded to custody after failing to post bail."[74] As the County emphasizes, Rossman was "taken into custody at the hospital; transported by [the Pennsylvania State Police] for an arraignment; lawfully committed to the [Centre County Correctional Facility] by a judge; and medically cleared for admission by medical professionals trained to recognize and treat spinal trauma."[75]

For the latter, the County insinuates that it had a policy, noting that Rossman's pleadings acknowledge that a nurse (who the County asserts was trained to treat spinal trauma) completed an intake form and that his hospital records were received by PrimeCare and then reviewed by another Nurse (who the County also asserts was trained to treat spinal trauma).[76] And the County also contends that Rossman has failed to allege a pattern of violations that would sustain a failure to train violation.[77]

---

[73]   Doc. 37 at 18–20.
[74]   *Id.* at 17.
[75]   *Id.* at 17–18.
[76]   *Id.* at 18.
[77]   *Id.* at 19–20.

But these arguments are not, at this initial stage, enough for Centre County to exit this suit. To start, the County offers no legal support for their claim that the actions of others, in remanding Rossman to custody, immunize it from suit.[78] So Rossman's allegation—that the County was deliberately indifferent in failing to have a policy assessing its ability to care for an injured detainee—will suffice.

Likewise unavailing are the County's claims about the sufficiency of its current intake policy and training program. In *City of Canton v. Harris*, the Supreme Court emphasized that inadequate training liability may arise when, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent . . . ."[79] Given the haphazard treatment that Rossman has alleged—and in particular, the number of times he was required by staff to move without his brace, which his discharge papers noted he required—he has a colorable claim that the County's policies and training were obviously inadequate and that his mistreatment was more than just a one-off occurrence.

Centre County's motion to dismiss Count XII is therefore denied.

---

[78]   *See id.* at 17–18.
[79]   *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

**IV.    CONCLUSION**

In reading through a complaint that details how a 22-year-old detainee's mistreatment resulted in his paralysis, there are many individuals and entities whose conduct strikes me as more culpable than Waite, Zettle, and Centre County. But it's not enough to look good by comparison. At this stage, Rossman's pleadings are adequate to survive this motion to dismiss. Whether discovery reveals that Waite and Zettle lacked the requisite scienter or that the County indeed had policies and training requirements, which were simply not followed, is another matter. Until then, this suit shall proceed with the original Defendants intact.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge