IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| DAVID B. ROSSMAN, | No. 4:21-CV-00703 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| PRIMECARE MEDICAL INC, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**JANUARY 10, 2024**

Five days removed from a car accident in which he sustained injuries requiring emergency spinal surgery, David Rossman was committed to the custody of the Centre County Correctional Facility pursuant to an outstanding bench warrant. Five days after that, Rossman left CCCF in an ambulance after the hardware holding his fractured vertebrae came loose, rendering the 22-year-old a tetraplegic.

Rossman believes that he would still be walking today if the staff of CCCF took appropriate steps to ensure that his discharge instructions were followed. He initiated this litigation, claiming that Centre County, the medical care provider at CCCF, PrimeCare Medical, Inc., and several individuals employed by the County and PrimeCare violated his constitutional right to medical care. Following discovery, the Defendants filed motions for summary judgment arguing that Rossman, at most, has a claim for medical malpractice and that this case does not belong in Federal

Court. Though the Court will grant Defendants' motions in part, it finds that a reasonable jury could conclude the medical care provided to Rossman during his stay at CCCF does not pass constitutional muster.

## I.   PROCEDURAL BACKROUND

Plaintiff David B. Rossman initiated this suit on April 15, 2021 against PrimeCare Medical, Inc., Dr. Rita Camacho, Elizabeth Corl, Katie Reese, Kim Hrabic, Kelsey Schmidt, Brandi Hugar, Stephanie Struble, Gabriel Pelaez, Jade Lose, and Alesha Weaver (collectively the "PrimeCare Defendants") and Centre County and Correctional Officers David Zettle and Mark Waite (collectively the "County Defendants").[1] In his Complaint, Rossman brings the following sixteen claims for relief:[2] Denial of Adequate Medical Care against Corl (Count I), Reese (Count II), Schmidt, Hugar, Lose, and Weaver (Count III), Struble (Count IV), Pelaez (Count V), Hrabic (Count VI), Camacho (Count VII), Waite (Count VIII), and Zettle (Count IX);[3] Failure to Intervene against all Individual Defendants (Count X); Failure to Supervise against Camacho, Pelaez, and Hrabic (Count IX); *Monell*

---

[1]   Compl., Doc. 1. The Complaint also names John/Jane Doe Medical Providers, Guards, and Supervisors. Rossman agrees that dismissal of the unidentified Defendants is appropriate. Centre County Mot. Summ. J. Opp. ("County BIO"), Doc. 108 at 12.

[2]   Counts I-XIII are brought under 42 U.S.C. § 1983. Counts XIV-XVI are styled as state law medical malpractice tort claims.

[3]   Count IX is brought against "Individual CO Defendants." As the unidentified individual defendants will be dismissed and Count VIII is brought against Waite, the Court will treat Count IX as being brought against Zettle, the sole remaining identified CO Defendant.

liability against Centre County (Count XII) and PrimeCare (Count XIII); and Medical Negligence against the PrimeCare Defendants (Counts XIV-XVI).

On April 5, 2022, the Court denied a motion to dismiss filed by Centre County Defendants.[4] Following extensive discovery, both PrimeCare Defendants and Centre County Defendants have filed Motions for Summary Judgment.[5] Those Motions are fully briefed and ripe for disposition.[6]

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  As expressed by the Supreme Court of the United States in *Celotex Corp. v. Catrett*, summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[7] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists

---

[4]    Apr. 5, 2022 Ord., Doc. 53.

[5]    PrimeCare MSJ, Doc. 78; County MSJ, Doc. 80.

[6]    PrimeCare MSJ Br. in Supp. ("PrimeCare BIS"), Doc. 93; PrimeCare MSJ Statement of Material Facts ("PrimeCare SMF"), Doc. 79; PrimeCare MSJ Opp. ("PrimeCare BIO"), Doc. 102; PrimeCare MSJ Response to SMF ("PrimeCare RSMF"), Doc. 100; PrimeCare Reply, Doc. 106; County MSJ Br. in Supp. ("County BIS"), Doc. 96; County SMF, Doc. 81; County BIO; County RSMF, Doc. 107; County Reply, Doc. 112.

[7]    477 U.S. 317, 322 (1986).

from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[8]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[9] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved by only a finder of fact because they may reasonably be resolved in favor of either party."[10] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[11] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[12]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[13] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[14] Moreover, "[i]f a party fails to properly support an assertion of

---

[8]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[9]   *Celotex*, 477 U.S. at 323.

[10]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[11]  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[12]  *Port Auth. Of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[13]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 422, 448 (1871)).

[14]  *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[15] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[16]

Local Rule 56.1 requires all motions for summary judgment to be "accompanied by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." The party opposing summary judgment must then include with its papers an answer to the movant's statement of facts in which it identifies, in corresponding numbered paragraphs, those material facts which the nonmovant contends there is a genuine issue to be tried.[17] "Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."[18] Material facts in the movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."[19]

---

[15] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[16] Fed. R. Civ. P. 56(c)(3).

[17] LR 56.1.

[18] *Id.*

[19] *Id.*

## III.    RELEVANT FACTUAL BACKGROUND[20]

### A.    Admission to Centre County Correctional Facility

Rossman was involved in a motor vehicle accident on October 10, 2020 resulting in spinal injuries.[21] The next day, October 11, 2020, Rossman underwent spinal surgery—a posterior cervical fusion and reduction of fracture—at the University of Pittsburgh Medical Center in Altoona.[22] James Burke, MD, provided post-surgical care to Rossman beginning October 12, 2020.[23] Dr. Burke formulated a plan in which Rossman was to wear a cervicothoracic orthotic ("CTO") brace when he was out of bed (except to shower) and a cervical collar at all times (also except to shower).[24] Rossman was told that failure to wear the brace as instructed could result in a failure of the hardware inserted in his spine during the surgery.[25] Rossman received the CTO brace on October 14, 2020 and an occupational therapist showed Rossman and his mother how to put the brace on.[26] Rossman required "max assist"—

---

[20]  The factual background is largely derived from the parties' statements of fact. Where the parties agree on a fact, the Court will cite the SMF and RSMF together. *E.g.*, SMF and RSMF ¶ 1. If a fact is disputed, the Court will look to the cited portions of the record, make its own determination, and resolve any disputes in favor of the non-moving party, Rossman.
  Where the Court cites deposition testimony, it will rely on the deposition transcripts filed by Centre County unless otherwise noted as the County filed the entirety of the transcripts rather than excerpts, obviating the need to cite to several different versions of the same document.
[21]  PrimeCare SMF and RSMF ¶¶ 27-28; County SMF and RSMF ¶ 1.
[22]  PrimeCare SMF and RSMF ¶¶ 29-30; County SMF and RSMF ¶ 16.
[23]  PrimeCare SMF and RSMF ¶¶ 20-23, 31.
[24]  *Id.* ¶¶ 32-33; County SMF and RSMF ¶ 18.
[25]  PrimeCare SMF and RSMF ¶ 31; County SMF and RSMF ¶ 19.
[26]  County SMF and RSMF ¶ 20.

the assistance of at least one other person—to put the CTO brace on, which was applied using a "roll" technique while Rossman was in bed.[27]

On October 15, 2020, with the approval of Dr. Robert Behm, Rossman was discharged from UPMC Altoona into the custody of the Pennsylvania State Troopers pursuant to an outstanding arrest warrant.[28] Trooper Wills transported Rossman to arraignment where Magisterial District Judge Kelley Gillette-Walker set Rossman's bail at $75,000.[29] Rossman could not post bail and Wills transported him to CCCF.[30] Wills remained with Rossman at CCCF for approximately ten minutes and then left.[31]

Rossman was wearing his CTO brace when he arrived at CCCF and Correctional Officer George Murphy requested assistance from the medical department to complete an unclothed search of Rossman.[32] After the search was completed, Murphy helped Rossman put his CTO brace back on.[33]

As part of a medical screening prior to Rossman's commitment to CCCF, Nurse Elizabeth Corl received the Discharge Summary from UPMC Altoona.[34] Among the records faxed to CCCF were treatment records dated October 14, 2020

---

[27] County RSMF ¶ 20; County SMF ¶ 145.
[28] County SMF and RSMF ¶¶ 2, 79-83.
[29] *Id.* ¶¶ 3-5, 8.
[30] *Id.* ¶ 10.
[31] County RSMF ¶ 15.
[32] County SMF and RSMF ¶¶ 229-230.
[33] County RSMF ¶ 203(f) (citing Doc. 100-2, PrimeCare RSMF Ex. 1).
[34] PrimeCare SMF and RSMF ¶ 55; County SMF and RSMF ¶¶ 21-22.

which recommended that Rossman be discharged to his home with family assistance, but acknowledged that, due to the outstanding arrest warrant, the likely disposition was to jail.[35] Dr. Burke testified that, while some patients may require additional assistance with the CTO brace, they do not need "babysitting."[36] Dr. Behm testified that it is acceptable to discharge a patient who cannot effectively don and doff a CTO brace as long as there will be someone available to help them.[37]

Corl was aware of the instructions that Rossman was to wear his cervical collar in bed and the CTO brace out of bed except to shower.[38] She sent a mass email to correctional and medical personnel regarding Rossman's restrictions which stated:

> He is to be bottom bunk, bottom tier, padded single cell, shower shoe restrictions, he has two C-collars (the single neck one is to be used at night/while sleeping) the full torso one is to be utilized while up and moving (do not shower with on), he also has a small wedge that is permitted to use under his head while sleeping.[39]

The purpose of the email was to ensure that correctional officers were aware of the specific instructions; an inmate is not granted permanent bottom bunk or bottom tier "status" or permitted to use shower shoes unless there is an order from the medical staff.[40] PrimeCare records indicate that Corl also contacted Dr. Rita

---

[35]   County SMF and RSMF ¶¶ 22-23, 140, 155.
[36]   PrimeCare SMF and RSMF ¶¶ 41-42.
[37]   County RSMF ¶ 97.
[38]   PrimeCare SMF and RSMF ¶ 74.
[39]   *Id.* ¶¶ 56-58.
[40]   *Id.* ¶¶ 59-60.

Camacho at the time of Rossman's receiving screening.[41] Corl read Rossman's discharge instructions to Camacho over the phone and Camacho issued an order directing that he be provided medications consistent with his prescriptions.[42]

Corl also contacted Kristina Varner, RN, employed by PrimeCare as the Health Services Administrator at CCCF, regarding Rossman's admission to the prison.[43] Generally, an intake nurse, if there are no concerns about a patient, is able to make the decision regarding whether an individual can be admitted to the prison or if the individual needs medical clearance.[44] As to Rossman, Corl called Varner to determine whether medical clearance was required, and Varner approved the Rossman's admission without medical clearance.[45]

Corl also discussed the CTO brace with Rossman and, though Rossman said that he understood how the brace worked and how to use it, Corl did not ascertain whether Rossman could put the brace on himself.[46] Further, Corl did not tell

---

[41] *Id.* ¶ 62.

[42] *Id.* ¶¶ 63-64.

[43] *Id.* ¶¶ 66-67.

[44] *Id.* ¶ 69.

[45] *Id.* ¶¶ 66, 70, 72. As stated in PrimeCare's SMF, it is not clear whether Corl called Varner to receive medical clearance or whether Corl called Varner to inquire as to whether clearance was necessary. In her deposition, Varner testified that "often times [an individual] would have to go back to the hospital for medical clearance to make sure that they were cleared to be there, safe to be there." Varner Dep., County SMF Ex. O, Doc. 81-15 at 25:2-9. As Rossman was not sent back to the hospital, the Court concludes that it was determined he could be admitted without clearance.

[46] The portion of Corl's deposition cited by PrimeCare on this point is part of a tangentially related question from Rossman's counsel and an objection to that question by PrimeCare's counsel. PrimeCare SMF ¶ 73 (citing Corl. Dep., PrimeCare Ex. C, Doc. 79-4 55:24-56:2). The preceding page of the deposition transcript is merely a back and forth between counsel which includes PrimeCare's counsel's characterization of Corl's earlier testimony, which is

Rossman how to request assistance putting the CTO brace on or taking it off.[47] Rossman once put the CTO brace on himself in an effort to find a comfortable sleeping position but was not confident that he was able to fit it correctly.[48]

Rossman understood the importance of properly using the CTO brace and cervical collar and the risks of walking without the CTO brace.[49] To avoid walking without the CTO brace, Rossman stayed in bed, wearing his cervical collar, as much as possible, only getting up to take his medications or to use the toilet.[50]

## B.    Stay at CCCF

Following his commitment to CCCF, Rossman requested, and was refused help from COs with his CTO brace on four consecutive days:

- On October 15, 2020, Rossman asked an unidentified CO for assistance with his CTO brace.[51] The CO refused to help Rossman "because of concerns with liability and because [Rossman] was on a COVID quarantine."[52]

---

not included in the exhibit filed by PrimeCare. Corl Dep., County SMF Ex. N, Doc. 81-14 55:1-17. *See also* PrimeCare RSMF ¶ 73.

[47]   County SMF and RSMF ¶ 205.

[48]   PrimeCare SMF ¶ 86; Rossman Dep., County Ex. A, Doc. 81-1 at 266:1-13.

[49]   PrimeCare SMF and RSMF ¶¶ 94-95.

[50]   *Id.* ¶¶ 95-98.

[51]   County SMF and RSMF ¶ 308.

[52]   *Id.*

- On October 16, 2020, Rossman asked another unidentified CO for assistance with his CTO brace and that CO also did not assist Rossman due to liability concerns.[53]

- On October 17, 2020, CO David Zettle refused to help Rossman with his CTO brace.[54]

- On October 18, 2020, calls out for help and receives no response.[55]

Medical staff conducted "medicine passes" two or three times a day in which a nurse would pass medication through a slot in the door.[56] Though Rossman admits he did not inform any of the nurses conducting med passes that he was having difficulties with his CTO brace, he asserts that this limited interaction—conducted through his cell door—did not provide him with the opportunity to do so.[57]

On October 17, 2020, Rossman took a shower without incident, but then was in pain upon returning to his cell.[58] At 6:18 p.m., Rossman called out for help and a

---

[53] *Id.* ¶ 316.

[54] *See infra* Section IV.A.7. Centre County argues that this allegation against Zettle is unsupported by admissible evidence. The Court discusses, and rejects, the County's argument below.

[55] PrimeCare RSMF ¶¶1(r), (s) (citing Rossman Video, PrimeCare RSMF Ex. 1, Doc. 100-2). Rossman suggests in his Opposition to Centre County's Motion that he is seen speaking with someone outside of the door on this occasion and that, based on the shift logs, that person would have been CO Folk. County BIO 13. It is unclear from the video whether Rossman is talking to someone outside of his cell as the top half Rossman's body and the door of his cell are not visible.

[56] County SMF and RSMF ¶ 305.

[57] *E.g.*, County RSMF ¶ 305.

[58] PrimeCare SMF and RSMF ¶¶ 99-100.

corrections officer contacted the medical department.[59] At 6:34 p.m., Nurse Stephanie Struble responded to Rossman's cell and conducted an assessment consisting of giving Rossman pain medication and touching his fingers where Rossman indicated he was feeling numbness and tingling.[60] Struble, concerned that Rossman's report of pain was too "emergent" to wait until the next day, then contacted the on-call provider, Physician's Assistant Gabriel Pelaez.[61]

About three hours later, Pelaez returned Struble's call and said that pain was to be expected due to Rossman's recent surgery, prescribed additional pain medication of 600mg of ibuprofen to be taken twice a day, and that there was no need to call back if the pain did not improve.[62] Pelaez's orders did not address Rossman's tingling sensation and Pelaez had no further involvement with Rossman's care.[63]

On the morning of October 18, 2020, Nurse Jade Lose saw Rossman in his cell to record his vitals, administer medication, and perform a detox check and COVID screening.[64] During this check-up, Rossman had his cervical collar on and

---

[59] *Id.* ¶ 101. Rossman's Response adds additional details. PrimeCare RSMF ¶ 101 (citing Rossman Video, PrimeCare RSMF Ex. 1, Doc. 100-2 at k).

[60] PrimeCare SMF and RSMF ¶¶ 102-104. Rossman's response adds additional details. PrimeCare RSMF ¶ 102 (citing Rossman Video at l.)

[61] PrimeCare SMF and RSMF ¶ 105; Struble Dep., County SMF Ex. U, Doc. 81-21 at 35:7-38:3.

[62] PrimeCare SMF and RSMF ¶ 107; PrimeCare RSMF ¶ 107; Struble Dep. 39:5-40:16.

[63] PrimeCare SMF and RSMF ¶ 108.

[64] *Id.* ¶¶ 125-128.

remained in his bunk.[65] Rossman was unable to stand up at the time due to being in too much pain.[66]

## C.    Hardware in Rossman's Spine is Displaced

On October 20, 2020, Rossman walked to an appointment with Physician's Assistant Kim Hrabic carrying his CTO brace.[67] Arriving at the appointment, which was part of the detox protocol and follow-up care from Rossman's hospitalization, Rossman asked Hrabic for and she provided assistance donning the CTO brace.[68] After returning to his cell, Rossman eventually removed the CTO brace and, while lying in his bunk wearing the cervical collar as instructed by Dr. Burke, felt a pop in his neck followed by "excruciating pain."[69]

Rossman alerted Correctional Officer Mark Waite who contacted the medical department.[70] Nurse Katie Reese received the call and alerted Hrabic who ordered an immediate x-ray.[71] Two hours later, Nurses Elizabeth Corl and Kelsey Schmidt, accompanied by Waite, went to Rossman's cell to take him to the medical

---

[65]   *Id.* ¶ 126.
[66]   *Id.* ¶ 128.
[67]   *Id.* ¶¶ 111-12.
[68]   *Id.* ¶¶ 111, 113.
[69]   *Id.* ¶¶ 115-116; PrimeCare RSMF ¶ 119.
[70]   PrimeCare SMF and RSMF ¶ 117; County SMF and RSMF ¶¶ 256-57.
[71]   PrimeCare SMF and RSMF ¶¶ 118-19. Specifically, PrimeCare says that "Hrabic ordered an additional x-ray and made the order stat." PrimeCare SMF ¶ 119. In the medical context, a "stat" order is "to be given or done immediately." *Stat*, Oxford English Dictionary Online Ed. (revised Dec. 2012), available at https://www.oed.com/dictionary/stat_adv?tab=meaning_ and_use#20893228; Hrabic Dep., County SMF Ex. M, Doc. 81-13 at 47:1.

department for his x-ray.[72] They initially wheeled the wheelchair into Rossman's cell, but then stopped and pulled the wheelchair back out.[73] Rossman was therefore required to walk to the wheelchair from his bed unassisted.[74] Once at the wheelchair, Rossman was then told to go back into his cell to retrieve his shoes.[75] While attempting to put his shoes on, Rossman lost his balance, causing additional pain and numbness.[76] Rossman informed Waite, Corl, and Schmidt of the additional pain and numbness.[77] At no point did Corl—who testified that she assumed medical staff who interacted with Rossman would encourage him, educate him, and assist him with any needs he would have with the brace[78]—or Schmidt put the CTO brace on Rossman or take any other measures to stabilize Rossman's spine and the brace was left in Rossman's cell.[79]

The technician who performed the x-ray found that the hardware in Rossman's spine was displaced and it was ordered that Rossman be sent to the hospital immediately.[80] Following the x-ray, the technician and Schmidt assisted

---

[72]   PrimeCare SMF and RSMF ¶ 120; PrimeCare RSMF ¶ 120 (citing Rossman Video at x); County SMF and RSMF ¶ 258.
[73]   PrimeCare RSMF ¶ 120 (citing Rossman Video at x).
[74]   *Id.*
[75]   *Id.*
[76]   *Id.*
[77]   *Id.*
[78]   PrimeCare SMF ¶ 75.
[79]   PrimeCare RSMF ¶ 120; Rossman Dep. at 237:1-7.
[80]   PrimeCare SMF and RSMF ¶¶ 121-22. Specifically, Rossman testified that the gist of the x-ray technician's statement was that Rossman was "not in any suit to be here right now. Get him out of here." Rossman Dep. 238:5-15.

Rossman back to the wheelchair.[81] While sitting in the wheelchair outside of the medical center waiting for emergency services to arrive, Schmidt and Corl switched Rossman's wheelchair.[82] Rossman required assistance to switch wheelchairs because he was unable to move his legs at this point.[83]

### D.    CCCF and PrimeCare Policies

At the relevant time, Centre County and PrimeCare had entered into a Comprehensive Health Services Agreement.[84] Under the Agreement, PrimeCare was responsible for medically clearing individuals prior to commitment at CCCF.[85] The Agreement provides that "decisions and actions regarding health care services provided to inmates/patients are the sole responsibility of qualified health care personnel."[86] CCCF policy provided that: (1) PrimeCare had "sole province on

---

[81]  PrimeCare RSMF ¶ 122; Rossman Dep. 239:7-10.

[82]  PrimeCare RSMF ¶ 122; Rossman Dep. 239:15-21.

[83]  PrimeCare RSMF ¶ 122.

[84]  County SMF and RSMF ¶ 200.

[85]  *Id.* ¶ 201. Rossman objects to this, and several other statements in Centre County's SMF on the basis that the "existence of a Health Services Agreement between PrimeCare and CCCF does not alleviate CCCF's duty to determine whether to commit an individual to the facility and/or determining whether the facility is capable [of] provid[ing] adequate medical care." County RSMF ¶ 201. This objection puts the liability cart before the factual background horse. The Court will address Rossman's legal argument regarding the import, or lack thereof, of the Agreement between CCCF and PrimeCare below. But the Court must first establish what the Agreement and attendant policies are. To that end, the Court's recitation of the related facts should not be understood as accepting their validity.

[86]  Health Svcs Agreement, County SMF Ex. W, Doc. 81-23 ¶ 12. The Court notes that the effective date of the Health Services Agreement filed as an exhibit by Centre County, January 1, 2021, postdates the events of this litigation. *Id.* ¶ 2. The Court assumes this is a clerical error and that the basic terms of the Agreement in place in October 2020 are substantially similar, if not identical, and could be introduced in the form of admissible evidence—*i.e.*, the correct Agreement—at trial. *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F. 3d 231, 238 (3d Cir. 2016) (evidence may be considered at summary judgment if it may be produced in an admissible form at trial).

matters involving medical judgment;"[87] (2) "Medical services are available twenty-four hours a day;"[88] (2) detainees may submit "medical request forms" or "sick call slips" which are picked up nightly;[89] and (3) medical staff completes intake screenings on all new commitments, informing the intake officer of any issues that need to be addressed such as "suicide precaution, protective custody, keep separates, or Medical attention (sent to Mount Nittany Medical Center)."[90]

CCCF also maintained a Policy and Procedure related to the commitment of new inmates and detainees.[91] This policy required all commitments to be made under the proper legal authority.[92] Intake Officers are to ensure that a commitments documentation is correct and complete.[93] If an Intake Officer is unsure of the medical condition of a commitment, they are to notify the shift commander and the medical department.[94]

Medical staff is responsible for completing initial assessments for all commitments.[95] Medical staff is also responsible for evaluating inmates who submit

---

[87] CCCF Policy, County SMF Ex. Y, Doc. 81-25 ¶ IV.A.2.
[88] *Id.* ¶ IV.B.1.
[89] *Id.* ¶ IV.B.9.
[90] *Id.* ¶ IV.C.
[91] County SMF and RSMF ¶ 218.
[92] *Id.* ¶ 219.
[93] *Id.* ¶ 221.
[94] *Id.* ¶ 220.
[95] *Id.* ¶ 222.

sick calls and communicating medical clearances and status changes to "appropriate staff members."[96]

Glenn Irwin was the Deputy Warden for Administration in October 2020.[97] He testified that a person must be cleared by the medical staff for commitment.[98] He relies on the determination of the PrimeCare medical staff to determine whether an individual can be admitted without further treatment.[99] He also testified that corrections officers do not treat inmates other than to provide "immediate first aid like CPR."[100]

Rossman did not read the CCCF Inmate Handbook and was unaware of the procedure for submitting a sick call slip while at CCCF.[101]

## IV.   ANALYSIS

### A.   Denial of Adequate Medical Care[102]

Prison officials violate a pre-trial detainee's Constitutional rights "when they act deliberately indifferent to a [detainee's] serious medical needs 'by intentionally

---

[96]   *Id.* ¶¶ 223-24; Medical Staff Post Order, County SMF Ex. BB, Doc. 81-28 at 496.
[97]   County SMF and RSMF ¶ 272.
[98]   *Id.* ¶ 274.
[99]   County SMF ¶¶ 275-79. Rossman denies these paragraphs of Centre County's SMF, arguing that this determination is non-delegable. County RSMF ¶¶ 275-79. The extent to which the County is permitted to delegate this determination, if at all, is a legal issue distinct from the inquiry of whether the determination was, in fact, delegated.
[100]  County SMF ¶¶ 289-90.
[101]  County SMF and RSMF ¶ 302.
[102]  Rossman concedes that Brandi Hugar and Alesha Weaver had no direct involvement in his medical care while he was a detainee at CCCF. PrimeCare BIO 19, 22; *accord* RSMF ¶ 123. Accordingly, the Court will grant PrimeCare Defendants' Motion on Count II as to those Defendants.

denying or delaying access to medical care or interfering with the treatment once prescribed.'"[103] In order to establish a violation of [David Rossman's] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."[104] The Defendants concede that Rossman had a serious medical need.[105] Therefore, the inquiry for each Defendant turns on whether they were deliberately indifferent to that need.

"[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."[106] "Allegations of medical malpractice" nor "mere disagreement as to the proper medical treatment" are sufficient to establish a constitutional violation.[107] "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm."[108] The Third Circuit has "found deliberate indifference in a variety of contexts including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge

---

[103] *Pearson v. Prison Health Service*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). The plaintiff in *Pearson* was a prisoner, rather than a pre-trial detainee, and thus subject to the Eighth Amendment. The analysis is the same for claims brought by pre-trial detainees under the Fourteenth Amendment. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *accord Thomas v. City of Harrisburg*, 88 F.4th 275, 281 n.23 (3d Cir. 2023).

[104] *Natale*, 318 F.3d at 582 (citing *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999)).

[105] PrimeCare BIS 17; County BIS 13.

[106] *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993))

[107] *Id.* (citing *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004)).

[108] *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (quoting *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009)).

of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs.[109]

### 1.    PrimeCare Defendants

Before turning to the arguments regarding the Individual PrimeCare Defendants, the Court will address a few global issues raised by PrimeCare as to Rossman's denial of medical care claims.[110] *First*, PrimeCare characterizes Rossman's theory as a failure by the PrimeCare Defendants to force him to wear his CTO brace. As discussed in greater detail below, though this is an issue, it is not the only issue. *Second*, the fact that there was no additional physical or occupational therapy ordered for an individual who was to be either lying in bed or wearing a CTO brace at all times is immaterial. Rossman's movements were severely restricted—it is reasonable to assume that any physical therapy regimen may have been ordered after subsequent follow up evaluations. *Third*, there is no evidence that Rossman disregarded any medical instructions. *Fourth*, the Court is similarly unmoved by PrimeCare's suggestion that Rossman did not submit any sick call slips

---

[109] *Pearson*, 850 F.3d at 538 (citing *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).
[110] PrimeCare BIS 19.

or grievances. This does not change the analysis for the complaints or requests for assistance that the PrimeCare Defendants were aware of.

## 2. Dr. Rita Camacho, MD

Rossman argues that Camacho exhibited deliberate indifference when she allowed him to be admitted to CCCF "without specific instructions or a plan to ensure compliance with the discharge instructions."[111] As an initial matter, Kristina Varner, not Camacho, approved Rossman's commitment to CCCF.[112] Further, Rossman has not identified any discharge instruction that Camacho's orders failed to account for. Rossman was scheduled for, and eventually received, follow up care.[113] Rossman has not identified any necessary follow up care that Camacho was aware of and unnecessarily delayed. The orders clearly state that Rossman is to wear his CTO brace when out of bed except to shower.[114] The Court is not persuaded by Rossman's suggestion that a more specific directive in Rossman's chart would have made any difference. The Court is similarly unmoved by Rossman's complaint that he was placed in a single cell with only a bed. Viewing the record in the light most favorable to Rossman, the Court accepts that he was unable to put the CTO brace on by himself. While lying in bed all day may be a dull existence, Rossman was in jail.

---

[111] PrimeCare BIO 15.

[112] PrimeCare RSMF ¶ 66.

[113] *See* PrimeCare SMF Ex. A., Doc. 79-2 at PCM 00342 (noting that follow up is scheduled); *supra* (discussing visit with Hrabic).

[114] PrimeCare SMF Ex. A at PCM 00342.

He has not offered any evidence or authority which supports his apparent position that being restricted to his bed amounted to a constitutional violation. Finally, Rossman acknowledges that short movements within his cell were consistent with his discharge instructions and has not explained why the short walk from his bed to his cell door is outside the scope of that permissible movement.

Therefore, the Court will grant PrimeCare's Motion as to Count VII.

### 3.    Stephanie Struble, LPN and Gabriel Palaez, PA-C

Responding to Rossman's "crying out in excruciating pain" after feeling a crack in his back on October 17, 2020, Struble briefly examined him and then contacted the on-call provider, Pelaez. Struble testified during her deposition that, when Pelaez returned her call three hours later, she told him exactly what she had written in Rossman's chart:

> Patient came in at 10/15 right from UPMC Altoona with a C5-7 fracture and a closed T4-5 fracture from a MVA. He is in a C-collar with a brace that goes down to his abdomen. This evening he took a shower and was fine. A little bit after the shower he couldn't even stand without excruciating pain that goes down his L arm and makes his fingers tingle. He rates the pain as a ten—says it was worse than the pain when he originally was injured. Orders?[115]

Pelaez subsequently prescribed ibuprofen and ordered a follow-up examination with Rossman's provider.[116] He also counseled that pain was to be

---

[115] PrimeCare BIO 20.
[116] *Id.*

expected following his surgery and that there was no need to call back if the pain did not improve.[117]

PrimeCare argues that Pelaez issuing an order for additional pain medication following Rossman's complaint of pain is insufficient to show Pelaez was deliberately indifferent.[118] In response, Rossman points out that Pelaez did not address—and PrimeCare does not address in its motion—the "[n]ew onset numbness in his left arm that radiated to his fingers and made them tingle."[119]

As described in Struble's notes, it was the pain that made Rossman's fingers tingle—not numbness. There is no evidence in the record that Pelaez understood that they were separate symptoms or that he did not believe ibuprofen was insufficient to treat both symptoms. Negligent diagnosis or treatment of a medical condition is insufficient to state a claim for an unconstitutional denial of medical care.[120]

As to Struble, she elevated Rossman's condition and was justified in following Pelaez's orders.[121] Rossman suggests that Struble erred when she "allow[ed] him to lie in bed crying in pain for hours" before Pelaez returned her call.

---

[117] *Id.*; *accord* PrimeCare BIS 24.
[118] PrimeCare BIS 24.
[119] PrimeCare BIO 21.
[120] *Pearson*, 850 F.3d at 538.
[121] *Id.* at 539-40, 540 n.4; *Smith v. O'Boyle*, 251 F. App'x 87, 89 (3d Cir. 2007).

However, Courts have routinely found that the delay of treatment for even excruciating pain for a few hours does not give rise to a constitutional violation.[122]

The Court is also not persuaded by Rossman's arguments that Struble exhibited deliberate indifference to his condition when she (1) performed only a cursory examination; (2) failed to convey the severity of Rossman's condition to Pelaez; and (3) required him to get out of bed to retrieve his nighttime medication.[123]

First, the "cursory examination" Struble performed was sufficient for her to make the determination that Rossman's symptoms were severe enough to warrant escalating to the on-call provider. Relatedly, to the extent that Struble failed to communicate the severity of Rossman's condition, this was either a result of a miscommunication between Struble and Rossman or Pelaez, or a misdiagnosis on Struble's part. Neither is sufficient to establish deliberate indifference, and there is nothing in the record from which a reasonable jury could find that Struble—who, again, thought that Rossman's symptoms were severe enough that she took the affirmative step to escalate the matter—consciously misled Pelaez.[124] Finally, as Rossman concedes, limited movements within his cell without the CTO brace would

---

[122] *Knepp v. Paraway*, No. 1:19-CV-00153, 2020 WL 7865401, at *9 (W.D. Pa. Nov. 18, 2020), *report and recommendation adopted,* No. CV 19-153, 2020 WL 7864199 (W.D. Pa. Dec. 31, 2020) (collecting cases).

[123] PrimeCare BIO 20.

[124] *See Sinclair v. City of Seattle*, 61 F.4th 674, 681 (9th Cir. 2023) (miscommunications insufficient to show deliberate indifference); *Pearson*, 850 F.3d at 538-39 (errors in judgment are insufficient to establish constitutional violation).

be within the guidelines of Dr. Burke's instructions.[125] Rossman nevertheless argues that retrieving his own medications were beyond the allowed for "short movements."[126] Assuming that there is a meaningful distinction to be made here, there is no evidence that Struble was aware of and consciously disregarded it.

Therefore, the Court will grant PrimeCare's Motion as to Counts IV and V.

### 4.    Jade Lose, LPN

PrimeCare notes that "Nurse Jade Lose's only involvement with [Rossman's] care was on October 18, 2020" when she "performed a COVID check, a detox check, and provided medications" to Rossman.[127] Rossman does not dispute this; rather his claim against Lose rests upon what she did not do: she did not "contact the medical provider on-call to report" Rossman's numbness and tingling in his left arm or review his chart to gain a better understanding of his condition.[128]

Lose testified that she would have read Corl's email regarding Rossman's admission to CCCF and his condition upon arriving for her shift.[129] She knew that Rossman's inability to stand up was "significant."[130] And yet, as PrimeCare concedes, the record is devoid of any evidence that Lose did anything other than make a note of Rossman's pain. Lose suggests that she would have informed the

---

[125] PrimeCare BIO 13.
[126] *Id.*
[127] PrimeCare BIS 25.
[128] PrimeCare BIO 21.
[129] Lose Dep., County SMF Ex. Q, Doc. 81-17 at 28:1-4.
[130] *Id.* 38:3-12.

next shift of Rossman's symptoms, but there is no indication that she did so.[131]

Unlike Struble, Lose cannot rely on the fact that Pelaez had issued orders regarding

similar symptoms the prior evening because it is not clear that she was aware he had

done so.[132] A reasonable jury could conclude that Lose was aware of, but ignored or

disregarded evidence of a serious need for medical care.

Therefore, the Court will deny PrimeCare's Motion as to Lose on Count III.

### 5.    Katie Reese, LPN and Kim Hrabic, PA

Reese received the call from Corrections Officer Mark Waite when Rossman

felt a pop in his neck and cried out in pain. She informed Hrabic, the provider on site

at the time, who ordered an x-ray. Rossman suggests that Reese should have

independently checked on Rossman herself after receiving the call, rather than

"allow[ing him] to lie in his cell in excruciating pain for two hours while he waited

to be taken to x-ray."[133] As with Struble, Reese is entitled to rely on the direction, or

lack thereof, of Hrabic.

Rossman also argues that Reese, who participated in Rossman's intake

process, "made no attempt to ensure Rossman received the assistance he needed"

despite the obviousness of "the consequences of not following the discharge

---

[131]  *See id.* 42:5-14 (testifying that she would have informed the next nurse), 49:16-50:8 (testifying
    that she does not recall sharing any concerns she had about Rossman).
[132]  *Pearson*, 850 F.3d at 540.
[133]  PrimeCare BIO 18.

instructions."[134] This conclusory argument, without any citations to the record regarding what Reese did or did not do or know, is insufficient to support a claim of unconstitutional denial of medical care.

As to Hrabic, once she received the report that Rossman felt a pop in his neck, she ordered an immediate x-ray. Rossman suggests that Hrabic should have also gone to his cell and examined him, ordered immediate intervention to immobilize him, or otherwise taken additional steps to respond to the "obvious sign of spinal trauma or injury."[135] He further faults Hrabic for leaving the facility after she ordered the x-ray, but before it was taken.[136] Though there are perhaps other things that Hrabic could have done, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."[137] The Court "must 'disavow any attempt to second-guess the propriety or adequacy of [the] particular course of treatment' so long as it 'remains a question of sound professional judgment.'"[138] Hrabic's exercise of her judgment may have been flawed, but that is insufficient to support a claim for an unconstitutional denial of medical care.

---

[134] PrimeCare BIO 18.

[135] PrimeCare BIO 19 (cleaned up).

[136] *Id.*

[137] *Palakovic*, 854 F.3d at 227 (citing *Durmer*, 991 F.2d at 67).

[138] *Pearson*, 850 F.3d at 538 (quoting *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).

Therefore, the Court will grant PrimeCare's Motion as to Counts II and IV.

### 6.    Elizabeth Corl, RN and Kelsey Schmidt, LPN

A reasonable jury could find that Corl and Schmidt acted with deliberate indifference when they, two hours after an immediate x-ray was ordered, required Rossman, a week removed from spinal surgery and in excruciating pain following hearing a pop in his neck, to walk to his wheelchair, walk back into his cell to put his shoes on unassisted, and then walk back to the wheelchair. Neither nurse assisted Rossman, put his CTO brace on, or made any other efforts to stabilize his spine.[139] The PrimeCare Defendants repeatedly suggest that it was reasonable to believe that Rossman would not have been discharged if he could not apply and utilize his CTO brace.[140] Even if the Court accepts this argument, at the time that Corl and Schmidt arrived at his cell to take him to an x-ray, a reasonable jury could find that the situation had clearly changed. Corl's and Schmidt's obdurate response to Rossman's clearly emergent condition is precisely what the Constitution forbids.[141]

Further, after x-rays revealed that the hardware in Rossman's spine was displaced, there was still no effort made to stabilize his spine. Instead, Schmidt again

---

[139] *See Ivers v. Brentwood Borough Sch. Dist.*, No. 2:20-CV-1244, 2021 WL 768166 at *4 (W.D. Pa. Feb. 26, 2021) (observing that the "inherent risk" in the failure to stabilize an individual's spine following a potential spine injury is "a matter of common sense").

[140] *E.g.*, PrimeCare Reply 4.

[141] The failure of Corl to assist Rossman in putting his CTO brace on at this point is particularly egregious as she apparently "assumed that medical staff who interacted with [Rossman] would encourage him, educate him, and assist him with any needs he would have with the brace." PrimeCare SMF ¶ 75.

put Rossman back in the wheelchair and then Schmidt and Corl required Rossman to switch wheelchairs, for which Rossman required their assistance because he could not move his legs.

In *Pearson v. Prison Health Service*, the Third Circuit reversed a grant of summary judgment against a nurse who forced an inmate who was in excruciating pain and unable to walk to crawl to a wheelchair to receive treatment.[142] Though Rossman was not forced to crawl to the wheelchair, the circumstances here are sufficiently analogous. Rather than suffering from appendicitis like the plaintiff in *Pearson*, Rossman was a week removed from spinal surgery and had symptoms that bore directly on the reasonableness of forcing him to walk, sit in a wheelchair, switch wheelchairs, all while making no efforts to stabilize his spine. A reasonable jury could conclude that the conduct of Schmidt and Corl similarly "violates a professional standard of care or . . . entails the obduracy and wantonness that is proscribed by the [Constitution]."[143]

Therefore, the Court will deny PrimeCare's Motion on Count I and on Count III as to Schmidt.

---

[142] 850 F.3d at 541.
[143] *Id.*

### 7.     Correctional Officer David Zettle

In his Complaint, Rossman alleges that correctional officers refused his request for assistance with his CTO brace on at least two occasions.[144] Though Rossman does not remember that Zettle in particular refused his request, video from Rossman's cell shows him going to the door of his cell with his CTO brace on October 17 and 18 during times that Zettle and Correctional Officer Folk were on duty, then dropping the brace and returning to bed.[145]

Zettle argues that the purported statements of the previously unidentified COs who refused to assist Rossman are hearsay and cannot be considered by the Court.[146] As a party opponent, statements made by Zettle are not hearsay.[147] Zettle's argument therefore relies on the premise that Rossman cannot identify Zettle as the individual on the other side of the door on October 17. The shift logs showing that Zettle was the CO on duty at that time are sufficient to establish by a preponderance of the evidence that Rossman was speaking to Zettle at the time. It is of little significance that Zettle testified during his deposition that he did not remember Rossman ever asking him for assistance with his CTO brace.[148] The viability of Rossman's claim

---

[144] County BIO 12; s*ee also, e.g.*, Am. Compl. ¶ 110.
[145] PrimeCare RSMF ¶ 1 (citing Video, Doc. 100-2); Oct. 27, 2020 Shift Log, County RSMF Ex. 16, Doc. 107-16.
[146] County Reply Section II.1.
[147] Fed. R. Evid. 801(d)(2)(A).
[148] Zettle Dep., County SMF Ex. J, Doc. 81-10 at 100:25-101-3.

does not depend on the ability of Zettle to remember the underlying interaction years later.[149]

Further, Zettle testified that he was told that Rossman was required to always wear his CTO brace other than when he was in bed.[150] This supports the inference that Zettle was aware of the importance of Rossman wearing the brace and that, by denying Rossman's request for assistance with it, Zettle impermissibly denied a reasonable request for medical care.

Zettle is nevertheless entitled to summary judgment on qualified immunity grounds unless he violated a right which "was clearly established at the time of [his] actions."[151] Zettle concedes that the right to medical care for a serious medical need while incarcerated was clearly established at the time of his incarceration.[152] The inquiry then is, as Zettle notes, whether his conduct was objectively reasonable. Zettle suggests that "[i]t was objectively reasonable that a corrections officer in [his] situation not to have understood that [Rossman] needed assistance with his CTO brace."[153] In support Zettle notes that various witnesses have testified that they believed Rossman could put the brace on without assistance.[154] However, Zettle was

---

[149]  Of course, it may be that there is nothing to remember. But, as the non-moving party, Rossman is entitled to have this inference drawn in his favor.
[150]  Zettle Dep. 95:18-25.
[151]  *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 247 (3d Cir. 2016).
[152]  County BIS 26 (citing *Farmer*, 511 U.S. 825; *Estelle*, 429 U.S. at 97).
[153]  *Id.* at 27.
[154]  *Id.* at 27-28 and record citations therein.

present when Rossman required CO George Murphy's assistance—and even offered some assistance himself on that occasion—to put the CTO brace on. Further, at the core of Rossman's claim against Zettle is that Rossman personally asked Zettle for assistance because he could not put the brace on himself.

Zettle also suggests that only medical staff, rather than COs, should have assisted Rossman with his brace.[155] However, this does not relieve Zettle of his obligation to alert medical staff that Rossman needed assistance.[156]

Therefore, the Court will deny Centre County's Motion as to Count IX.

### 8.   Correctional Officer Mark Waite

Rossman argues that CO Mark Waite exhibited deliberate indifference on October 20, 2020 when he failed to provide medical care after Rossman felt a pop in his neck and cried out for help.[157] Waite called the medical staff whom he eventually escorted to Rossman's cell when they responded with a wheelchair two hours later. As with Rossman's claim against Nurse Struble, Waite cannot be held liable for not responding in the intervening two hours because 1) he is entitled to rely on the judgment of the medical staff[158] and 2) courts have routinely held that

---

[155] County BIS at 28.
[156] *Cf. id.*
[157] County BIO 15-17.
[158] *Pearson*, 850 F.3d at 539-40.

delaying treatment of even excruciating pain for a few hours is not a constitutional violation.[159]

Rossman also claims that Waite exhibited deliberate indifference when he failed to provide medical care when he arrived at Rossman's cell with Nurses Corl and Schmidt.[160] Again, Waite is entitled to rely on the judgment of the medical staff, and there are no allegations or evidence to suggest that Waite delayed the arrival of the medical staff in any way. Rossman does allege that, when the Nurses did arrive with the wheelchair, after Rossman walked to the wheelchair Waite ordered him back into his cell to put his shoes on.[161]

The Court is persuaded that it is unreasonable to require Rossman to walk to the wheelchair, then back from his wheelchair to put his shoes on. Doing so did deny Rossman medical care, if only for a few seconds, but only after care had been delayed for two hours. Further, Waite only told Rossman to put his shoes on after the Nurses allowed him to walk to the wheelchair in the first instance. There is insufficient evidence in the record from which a jury could conclude that Waite knew his request was unreasonable in light of the circumstances.

Therefore, the Court will grant Centre County's Motion as to Count VIII.

---

[159] *Knepp*, 2020 WL 7865401, at *9.
[160] County BIO 15-17.
[161] Rossman Dep. 233:5-20. For his part, Waite testified that he could not remember telling Rossman to put his shoes on. Waite Dep., County SMF Ex. I, Doc. 81-9 at 44:16-46:13. Nevertheless, there is sufficient evidence—the video and Rossman's testimony—from which a reasonable jury could conclude that Waite did give the directive.

### B.      Failure to Intervene

In their briefing on this issue, the PrimeCare Defendants and Rossman discuss extensively the opinion of my friend and colleague, the Honorable Yvette Kane, in *Thomas v. City of Harrisburg*.[162] That case involved allegations that a detainee was denied emergency medical care after he ingested cocaine and was transported to prison, rather than the hospital. Judge Kane denied a motion to dismiss plaintiff's failure to intervene claim, finding that the alleged failure of any defendant officer to take him to the hospital was sufficient to survive dismissal.

On December 6, 2023, after the parties in this case completed their briefing, the Third Circuit issued its own opinion in *Thomas v. City of Harrisburg*, disagreeing with Judge Kane.[163] The Third Circuit held that the defendant officers were entitled to qualified immunity on the failure to intervene claim as it had not previously "recognized a constitutional duty to intervene to prevent the violation of the right to medical care."[164] The court also observed that the right to have a government actor intervene is limited to cases of excessive force or sexual assault of a person in custody or detention.[165]

---

[162] No. 1:20-CV-01178, 2021 WL 4819312 (M.D. Pa. Oct. 15, 2021), *aff'd in part, rev'd in part and remanded sub nom. Thomas v. City of Harrisburg*, 88 F.4th 275 (3d Cir. 2023).
[163] 88 F.4th 275.
[164] *Id.* at 285 n.55.
[165] *Id.* at 285

Further, as in *Thomas*, "a claim for failure to intervene would be almost identical to the underlying claim of failure to render medical care" as it would have been virtually impossible for any of the Individual Defendants here "to have had knowledge of an ongoing violation of a right to medical care without themselves participating in that violation."[166]

Therefore, the Court will grant PrimeCare's and Centre County's Motions as to Count X.

## C.    Failure to Supervise

"'Failure to' claims—failure to train, failure to discipline, or, as is the case here, failure to supervise—are generally considered a subcategory of policy or practice liability."[167] The Third Circuit has established a four part test for determining whether an official may be held liable on a claim for failure to supervise:

> The plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.[168]

---

[166] *Id.* at 285 n.55.

[167] *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015) (citation removed).

[168] *Id.* at 317 (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989); *Brown v. Muhlenberg Twp.,* 269 F.3d 205 (3d Cir.2001)).

PrimeCare argues that Rossman's failure to supervise claims, brought against Dr. Camacho, Pelaez, and Hrabic, are duplicative of the *Monell* claim against PrimeCare.[169] To the extent that Rossman's claims do not rely on the direct participation in the alleged constitutional violation by Camacho, Pelaez, and Hrabic, the Court agrees.[170] Further, to the extent that Rossman claims the trio personally participated in violating his rights, those claims are duplicative of his claims against them as individuals, discussed above.[171] Even if the Court assumes that Camacho, Pelaez, and Hrabic had a legal obligation to supervise the nursing staff,[172] Rossman's arguments are insufficient to support a claim that they violated that duty separate from their own involvement in Rossman's care.[173]

Therefore, the Court will grant PrimeCare's Motion as to Count XI.

### D.    *Monell* Liability

The Supreme Court held in *Monell v. Department of Social Services of City of New York* that a governmental entity may be held liable under Section 1983 "when execution of a government's policy or custom" results in a constitutional injury

---

[169] PrimeCare BIS 28.

[170] *See infra* Section IV.D (discussing *Monell* claim against PrimeCare); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.").

[171] *Cf.* PrimeCare BIO 25 (asserting that Rossman has "provided ample evidence to show that Camacho, Pelaez, and Hrabic participated in violating" his rights and noting that the nature of the violation is set out in his discussion of his denial of adequate medical care claims).

[172] There is some support for this argument. *E.g.*, *Billops v. Sandoval*, 401 F. Supp. 2d 766, 774 (S.D. Tex. 2005).

[173] *See generally* PrimeCare BIO 15-21.

inflicted by its employees or agents.[174] The Third Circuit has "reiterated [that] a § 1983 claim against a municipality may proceed in two ways: (1) A plaintiff may put forth an unconstitutional policy or custom of the municipality that led to his or her injuries; or (2) that [the injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice."[175] A plaintiff complaining of an unconstitutional policy or custom must point to an official policy established by a decisionmaker with the authority to do so or a course of conduct so well-settled and permanent as to virtually constitute law.[176] Alternatively, a plaintiff proceeding under the latter theory "has the separate, but equally demanding requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality."[177]

Ordinarily, to establish deliberate indifference on the part of a governmental entity a plaintiff must show that the entity had been put on notice of its failure by a pattern of prior constitutional violations.[178] Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have

---

[174] 436 U.S. 658, 694 (1978).

[175] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019); *Monell*, 436 U.S. at 694; *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)) (internal citations and quotations removed, punctuation modified, and numbering added).

[176] *Id.* at 105-106 (citing *Roman*, 914 F.3d at 798; *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)).

[177] *Id.* at 106 (citing *Roman*, 914 F.3d at 798).

[178] *Thomas v. Cumberland County*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Connick v. Thompson,* 563 U.S. 51, 62 (2011)).

deliberately chosen a course of action that will cause violations of constitutional rights."[179] In "single-incident" cases—cases without evidence of prior constitutional violations—a plaintiff faces a high burden to show that the suffered violation was a highly predictable consequence of a situation that policy makers "know to a moral certainty" that is likely to occur.[180] "Liability in single-incident cases depends on 'the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'"[181]

A *Monell* defendant may be held liable even where its officers are not unless such a finding would create an inconsistent ruling.[182] Situations where the *Monell* defendant may cause constitutional harm without any individual defendant violating the plaintiff's rights include those "where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."[183]

A private entity acting under color of state law is subject to *Monell* liability. Further, the obligation of the government to provide medical care to those in the

---

[179] *Id.* (quoting *Connick*, 563 U.S. at 62).

[180] *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10); *accord Natale*, 318 F.3d at 584-85.

[181] *Id.* at 223-224 (quoting *Bryan Cnty*, 520 U.S. at 409).

[182] *Mervilus v. Union County*, 73 F.4th 185, 196 (3d Cir. 2023) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010)).

[183] *Id.* (quoting *Speer v. City of Wynne*, 276 F.3d 980, 985–86 (8th Cir. 2002)).

custody of its jails is non-delegable.[184] There is no "difference of constitutional import" between a government's obligation to supervise government employed staff and the obligation to supervise private, third-party providers contracted to provide medical care.[185] Therefore, "the policy of the private entity becomes the policy of the government."[186]

Rossman brings separate *Monell* claims against PrimeCare and Centre County. To the extent that Rossman brings distinct claims against each Defendant, the Court will address them separately. Where the claims overlap, or Rossman seeks to hold Centre County liable for PrimeCare's allegedly deficient policies, the Court will analyze them together.

### 1.   Underlying Constitutional Violations

Both PrimeCare and Centre County argue that Rossman's *Monell* claim fails because there is no underlying constitutional violation.[187] As the Court has found that a reasonable jury could conclude that Lose, Corl, Schmidt, and Zettle were

---

[184] *Johnson v. Stempler*, 373 F. App'x 151, 154 (3d Cir. 2010) (citing *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 705–06 (11th Cir.1985)).

[185] *Barkes*, 766 F.3d at 326-27.

[186] *Black v. Allegheny Cnty.*, No. 2:13-CV-0179, 2014 WL 5493811 at *10 (W.D. Pa. Oct. 30, 2014). *See also Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (observing that an individual's conduct implements official policy when that individual has been delegated the authority to act for the government); *accord Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010). The Health Services Agreement makes clear that the County is delegating to PrimeCare the "responsibility [to] provid[e] comprehensive health care services for all persons committed to the care, custody, and control of the Centre County Correctional Facility." County SMF Ex. W at 1.

[187] PrimeCare BIS 31.

deliberately indifferent to Rossman's need for medical care, Defendants are not entitled to summary judgment for want of a constitutional violation.

Further, a reasonable jury could also find that the medical care Rossman received from the PrimeCare staff was far less than the sum of its parts and amounted to deliberate indifference. The only medical professionals involved in Rossman's care on more than one occasion in his five-day stay at CCCF are Corl and, to the extent that requesting the x-ray then leaving the facility constitutes involvement, Hrabic. PrimeCare cannot divide and conquer its constitutional obligation simply by spreading it across a dozen individuals, then plead ignorance regarding the condition of the individuals in its care. By the time Hrabic evaluated Rossman on October 20, 2020 and told him to alert staff of any worsening symptoms, Rossman had already done so on at least two separate occasions.[188] A reasonable jury could find that Corl knew that Rossman could not put his brace on. Notes by PrimeCare staff, let alone Rossman's discharge instructions, were ignored or unavailable to other medical staff. Even if most of the individuals on the medical staff may have been ignorant of Rossman's symptoms and struggles with his CTO brace, collectively PrimeCare had all the information it needed to recognize Rossman's deteriorating condition in the days leading up to his becoming paralyzed.

---

[188]   PrimeCare Records, PrimeCare SMF Ex. A at PCM 00255, 00343. *See also* discussion of Lose, Struble, and Pelaez *supra* Sections IV.A.3-4.

A reasonable jury could also find that the unidentified COs who refused to help Rossman with his CTO brace on October 15 and 16 similarly exhibited deliberate indifference. It is undisputed that those COs refused to assist Rossman due to liability concerns and that it was necessary that Rossman wear his brace when out of bed.[189] Liability concerns are not a valid reason to deny medical care.[190]

### 2. Defendants' Policies and Customs

In his oppositions to Defendants' Motions, Rossman alleges that PrimeCare's and Centre County's policies are nonexistent or deficient in several respects which broadly fall into four categories: (1) nonexistent or inadequate policies and procedures to determine whether the facility has the means to provide the necessary care; (2) nonexistent or inadequate policies and procedures to ensure that hospital discharge instructions are implemented; (3) nonexistent or inadequate policies for informing medical and non-medical staff of serious medical conditions and needs; and (4) nonexistent or inadequate training for medical and non-medical staff regarding spinal trauma.[191] The Court addresses each in turn.

### i. Medical Intake and Commitment

Rossman alleges that PrimeCare does not have a policy requiring a review of a patient's medical records prior to committing an individual arriving directly form

---

[189]   County SMF and RSMF ¶¶ 308, 316.

[190]   Such a denial of care could fall into any of the four circumstances in which the Third Circuit has previously found deliberate indifference. *Pearson*, 850 F.3d at 538.

[191]   PrimeCare BIO 27-28; County BIO 20-24.

a hospital.[192] He further alleges that Centre County failed to establish policies which (1) require a thorough review of a potential commitment that presents with a serious medical condition, namely spinal trauma; (2) allow for a determination whether the facility has the means to care for an individual arriving in such a condition; and (3) prevent the admission of an individual if such care cannot be provided.[193]

For its part, Centre County argues that it does have such a policy—it relies on the PrimeCare medical staff to make this determination.[194] This is not a policy. It is a delegation of the obligation to institute such a policy to PrimeCare.

Describing the intake procedure, PrimeCare cites Kristina Varner's deposition:

> [T]he nurses for the intake process, as long as there was nothing concerning about the patient, then they were able to make the decision whether the payment stayed or if the patient would need to have medical clearance or something like that. Now they would also have to contact the doctor just to run through medications, make sure that everything would be accommodated that they were already taking, stuff like that. Any patient in question, they would need to call me just to confirm.[195]

Varner also testified that CCCF was capable of handling "almost every person that would ever come in" and that she "never fully rejected an inmate," though she

---

[192] PrimeCare BIO 27.
[193] County BIO 20-21.
[194] County Reply 17-18.
[195] Varner Dep., County SMF Ex. O, Doc. 81-15 at 21:4-13; *see also* PrimeCare SMF ¶¶ 69-70 (citing Varner's deposition).

would send inmates "to the hospital for medical clearance" if necessary.[196] However, there is no evidence in the record regarding how, or according to which standards, if any, these decisions are made.

The Court is also unpersuaded by Defendants' arguments that UPMC Altoona discharging Rossman with the knowledge that there was a warrant for his arrest necessarily cleared him for commitment at CCCF. It is CCCF who accepts responsibility for the care of those committed to the facility, not UPMC. It is PrimeCare who is familiar with capacity of the specific facility and its staff to provide that care, not UPMC.[197]

Defendants also make too much of Rossman's discharge documents acknowledging that his likely disposition was jail. The Defendants' argument assumes that those responsible for Rossman's discharge at UPMC Altoona were aware to which jail Rossman was being discharged and the capabilities of that jail to accommodate Rossman's needs. There is no evidence in the record that this is the case.[198] Further, the Defendants' argument that, even if Rossman had been sent to the hospital for clearance, he would have simply been sent back again is both speculative and assumes the staff at the hospital would have been completely

---

[196] Varner Dep. 25:2-9.

[197] *See* PrimeCare RSMF ¶ 38 (discussing Dr. Burke's testimony regarding patients who are discharged to jail, including the nature of the care that is available and provided by the jail).

[198] Nor is there any evidence that Varner, or anybody else, relied on UPMC's note that Rossman was likely to end up in jail in making its determination. The Court therefore only considers it to the extent that it is offered as evidence that it was reasonable for CCCF itself to commit him.

incurious as to why Rossman was there. Defendants' argument conjures an image of individuals with serious medical conditions being carted around between prison and hospital with no communication regarding what the prison's or hospital's concerns are. The Court also notes that, if an individual is sent to a hospital for clearance, CCCF policy provides that they are sent to Mount Nittany Medical Center, not UPMC Altoona. Perhaps, as Centre County suggests, Mount Nittany would have simply rubberstamped Rossman's commitment at CCCF just as Defendants say UPMC did.[199] However, it is not a foregone conclusion as Mount Nittany is presumably more familiar with CCCF's facilities and capabilities.

Defendants also argue that they are under no obligation to "conduct research into [Rossman's] medical history" and that, even if CCCF's policies were not "the best," they do not rise to the level of deliberate indifference.[200] The cases Defendants rely on in support are inapposite. Rossman's claims do not rest on a failure by CCCF to "gather[] and review[] *all* of [his] past medical records"[201] or review his legal records for upcoming "high risk" court hearings which may increase the chance he would commit suicide.[202] There was no need to conduct additional research into

---

[199] County Reply 17.

[200] *Id.* at 18-19; PrimeCare Reply 8-9.

[201] *Cf. Cohen v. Kids Peace Nat. Ctrs., Inc.*, 256 F. App'x 490, 492 (3d Cir. 2007) (emphasis added) (cited by County Reply at 19; *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 445-446 (E.D. Pa. 2020)).

[202] PrimeCare Reply 8-9 (discussing *Alexander v. Monroe Cnty.*, No. 3:13-CV-01758, 2016 WL 6953477 (M.D. Pa. Sept. 7, 2016)).

Rossman's medical or legal history; his discharge instructions had already been provided to CCCF and Defendants cannot simply ignore information they already have in their possession.

Nevertheless, Rossman's claim here fails for a more basic reason—causation. It is not enough to identify a deficient policy; it must also have "caused the constitutional violation . . . allege[d]."[203] Rossman claims that it was the failure to adhere to his discharge instructions, namely that he always wear the CTO brace when not in bed, that caused the failure of the surgically inserted hardware and resulting paralysis.[204] Rossman argues that PrimeCare and CCCF staff should have helped him with his brace and made other adjustments so that he could have abided by his discharge instructions. He does not, however, argue that CCCF staff was incapable of doing these things. On the contrary, he faults various COs for not helping him with his CTO brace and elicited testimony that staff could have done so or, at a minimum, sought assistance from the medical staff.[205] Dr. Behm also agreed that it was acceptable for Rossman to be discharged to jail provided there was someone who could help him with the CTO brace.

Ultimately, the accommodations that Rossman required were quite basic and there is nothing in the record that suggests CCCF could not provide them.

---

[203] *Natale*, 318 F.3d at 584 (citing *Bryan County,* 520 U.S. 397, 404 (1997)).
[204] *E.g.*, Report of Dr. Taha, PrimeCare RSMF Ex. 3, Doc. 100-4 at 2.
[205] County SMF and RSMF ¶ 127.

ii.     **Policies Regarding Implementation of Discharge Instructions**

Rossman argues that Defendants do not have policies requiring the review and implementation of discharge instructions of a detainee arriving directly from a hospital or the communication of those instructions to all medical and non-medical personnel.[206] In particular, he alleges that the County's policies and training "were not adequate to treat an individual with spinal trauma who was discharged from the hospital with specific discharge instructions."[207]

PrimeCare has relatively little to say in defense of its policies and procedures:

> The policies and procedures for the provision of medical care all conform to national accreditation standards. Plaintiff had access to medical professionals multiple occasions per day. He was evaluated by a physician's assistant, had x-rays ordered and was scheduled for his neurosurgical follow up appointment. At no time did anyone refuse to provide assistance to Plaintiff. Plaintiff was discharged from the hospital to prison.[208]

Notably absent from the above paragraph, which represents the entirety of PrimeCare's argument in its opening brief that its policies and procedures are not deficient, are any citations to the record. There is no description of the policies and procedures in place, let alone any proof that they conform to any accreditation standards. The nature of Rossman's access to medical care is a hotly contested issue. Indeed, Rossman was only evaluated by a physician's assistant who told him to alert

---

[206] PrimeCare BIO 27; County BIO 21.
[207] County BIO 22.
[208] PrimeCare BIS 31-32.

staff of worsening symptoms after he had already done so on multiple occasions. As discussed above, the circumstances surrounding Rossman's x-ray are hardly evidence of suitable policies. Rossman asked for and was refused assistance with his CTO brace on multiple occasions. That Rossman was discharged from the hospital to prison is irrelevant.

In its reply brief, PrimeCare does little to fill these gaps and misconstrues Rossman's position, suggesting that he claims only "that he should not have been accepted to the prison."[209] Whether CCCF had the ability to care for Rossman, and was therefore justified in admitting him, is an issue distinct from whether there were sufficient procedures in place to ensure that care would in fact be provided. As to the latter issue, at best it appears that PrimeCare simply operated on the assumption that someone would provide the required care.[210]

Centre County stresses CCCF policies required medical services were available to Rossman twenty-four hours a day and suggests that it is Rossman himself who is to blame for not availing himself of those services.[211] The County

---

[209] PrimeCare Reply 7. PrimeCare does also say that Rossman "also claims that the policies and procedures were deficient and needs improvements." *Id.* This says nothing about what policies and procedures Rossman claims are deficient and, read in the context of PrimeCare's argument, appear to refer only to the policies and procedures related to his admission.

[210] *E.g.,* PrimeCare SMF ¶ 54 (noting that it was "assumed" that Rossman could apply and removed the CTO brace since he was being discharged from the hospital); ¶ 75 ("Nurse Corl assumed that medical staff who interacted with Plaintiff would encourage him, educate him, and assist him with any needs he would have with the brace."); ¶ 82 (Corl assumed Rossman could use the brace).

[211] County Reply 19-20.

further argues that "it was the responsibility of the medical staff to ensure that [Rossman's] discharge instructions were adhered to."[212] In support of this purported delegation of responsibility, the County notes that "the October 15, 2020 email sent by Nurse Corl to the medical and corrections staff did not provide specific instructions to the corrections staff on how to follow through with Plaintiff's discharge instructions."[213]

It is hardly clear from the record before the Court that there was an appropriate mechanism for which Rossman could have requested and received the required assistance with his CTO brace. Though Rossman did not submit any sick call slips, a reasonable jury could find that process, in which the submitted slips were not reviewed until the evening and action might not be taken for days, is not an appropriate mechanism for requesting assistance for a more immediate need such as donning the CTO brace. Further, while Rossman may not have asked every person he encountered at CCCF for assistance, the record shows that on the occasions he did make such a request he waited hours for help if it came at all.[214]

---

[212] *Id.* 19.

[213] *Id.*

[214] Defendants certainly may ask Rossman at trial why he did not make additional requests for help and a jury may consider his and other witnesses' credibility as well as weigh the evidence presented by the parties and ultimately conclude that his failure to do so limits or precludes Defendants' liability. But the Court must view the record in the light most favorable to Rossman, and a reasonable jury could conclude that Rossman is not required to repeatedly make requests after they have been denied on several occasions.

Accompanied only by correctional officers, who do not administer health care beyond emergency first aid, Rossman was forced to walk to the shower and to his appointments with the medical staff without wearing the CTO brace as required by his discharge instructions. Defendants have not identified any procedure through which either correctional officers would be instructed how to provide the required assistance or medical staff would be made available to assist Rossman as needed in the ordinary course of the day.[215] A reasonable jury could conclude that Defendants failure to establish a policy to address immediate, non-emergency medical needs of inmates with serious medical conditions is a "'particularly glaring omission' in a program of medical care" and "creates a risk that is sufficiently obvious as to constitute the deliberate indifference to those inmates' medical needs."[216] Viewing the record in the light most favorable to Rossman, Defendants disregarded an obvious risk, that the failure to provide certain inmates—*i.e.*, those who have recently undergone surgery—timely medical care could result in serious complications.

---

[215] That Rossman was required to walk to his appointment with Hrabic before he could get assistance with his CTO brace appears to be a particularly glaring example of a gap in CCCF policies and procedures.

[216] *See Natale*, 318 F.3d at 585 (quoting *Bryan County*, 520 U.S. at 410-11) (finding that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious).

### iii.        Policies for Informing Staff of Medical Needs

Rossman's arguments regarding Defendants' policies regarding the sharing of

medical information relate to how the information is shared among the medical staff

and how it is shared with non-medical staff. As to the sharing of information among

the medical staff, Rossman asserts that there is no policy for (1) providing on-call

providers access to medical records; (2) requiring on-call providers to review critical

medical information; and (3) requiring critical information regarding a patient's

medical condition be relayed to and between medical personnel.[217]

PrimeCare has not advanced any argument regarding its policies, or lack

thereof, for the sharing of information either among the medical staff or with

corrections officers. Centre County again notes that Rossman "admits the October

15, 2020 email sent by Nurse Corl to the medical and corrections staff did not

provide specific instructions to the correction staff on how to follow through with

[Rossman's] discharge instructions."[218]   Further, even if the email did provide

specific instructions, Centre County has also taken the position that the COs who

received the email did not in fact receive any information regarding Rossman's

medical condition.[219]

---

[217] PrimeCare BIO 27-28.
[218] County Reply 19.
[219] *E.g.*, County SMF and RSMF ¶ 232 (asserting that CO Murphy, who received the email, "did not receive any medical documents" related to Rossman), ¶ 252 (asserting that CO Waite "was not aware [Rossman] had medical orders stating that he must always have is CTO brace on

Nevertheless, the Court finds that that the procedural inadequacies identified by Rossman are insufficient to support a "single incident" *Monell* claim of deliberate indifference. There is insufficient evidence from which a reasonable jury could conclude that the procedures for sharing information among the medical staff—putting notes in Rossman's files or sharing information over the phone with the on-call providers—meaningfully deviate from generally accepted practices in the health care industry, let alone that they created an obvious risk of constitutional injuries.

As to the sharing of information with correctional staff, the Court is skeptical that reliance on emails which nobody seems to read and that only contain less than specific details is an effective means to communicate important information regarding the medical status of detainees. Even so, such a deficiency is insufficient to support a single incident deliberate indifference claim. This situation does not present the sort of "difficult choice" that Centre County would have necessarily known its correctional officers would face.[220] The obligation to provide medical care is well established and should be sufficiently obvious to any correctional officer, even in the absence of specific directives to do so for individuals such as Rossman. Therefore, in the absence of a pattern of correctional officers refusing to provide

---

other than [when in] bed"), ¶¶ 282-86 (asserting that the email simply informed staff that Rossman had a c-collar and CTO brace, but provided no further information).

[220] *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999).

such care (either themselves or by summoning the medical staff), Centre County cannot be said to have been on notice of an inadequate policy.

### iv.      Lack of Training

Rossman argues that PrimeCare failed to train its medical staff to "perform medical evaluations, diagnosis, care, and treatment for individuals with spinal trauma."[221] He further argues that Defendants collectively failed to train staff to recognize possible spinal trauma or how to properly "handle a potential spinal trauma to prevent further spinal damage."[222]

Again, PrimeCare does not argue that it has in fact sufficiently trained its staff nor does Rossman offer any evidence of prior incidents which would have put Defendants on notice that the staff were not sufficiently trained. Centre County also fails to address Rossman's argument on this issue beyond its stance that such issues fall within the purview of the medical staff only.

There is sufficient record evidence from which a reasonable jury could conclude that medical staff was insufficiently trained to evaluate and treat back trauma. Hrabic's (self-serving) suggestion that a patient who has suffered a spinal trauma is properly immobilized if they are transported in a wheelchair[223] defies

---

[221] PrimeCare BIO 28.
[222] *Id.*; County BIO 24.
[223] Hrabic Dep. 50:12-54:10.

common sense.[224] As does Corl's and Schmidt's decision to do just that. Dr. Camacho also testified that she had no professional familiarity with CTO braces.[225]

The need for medical staff at a jail to be trained to evaluate and treat spinal trauma is sufficiently obvious to support a single incident deliberate indifference claim. There are countless Eighth Amendment cases which include allegations

---

[224] *Ivers*, 2021 768166, at *4.
[225] *See* Camacho Dep. 45:12-46:12 (testifying that her only experience with a CTO brace came from helping her mother-in-law following back surgery).

related to the denial of care for serious back issues.[226] PrimeCare itself has been a

party to several such cases.[227]

---

[226] A reasonably targeted Westlaw search turns up hundreds of such cases within the Third Circuit. *E.g.*, *Trainor v. Wellpath*, No. 1:20-CV-00225-RAL, 2023 WL 2603196 (W.D. Pa. Mar. 22, 2023) (plaintiff claims improper treatment of back pain led to permanent nerve damage); *Garrett v. Naji*, No. 3:14-CV-00031, 2022 WL 16733618 (W.D. Pa. Aug. 24, 2022), *report and recommendation adopted*, No. 3:14-CV-31, 2022 WL 5119838 (W.D. Pa. Oct. 5, 2022) (denying summary judgment where plaintiff suffering from back pain claimed that prison doctor denied access to a walker); *Millhouse v. United States*, No. 1:19-CV-00665, 2021 WL 2412930 (M.D. Pa. June 14, 2021) (plaintiff brought claims that he was denied medical care following a back surgery); *Perez v. Chester CI*, No. 20-CV-4562, 2021 WL 1962928 (E.D. Pa. May 17, 2021) (denying motion to dismiss where plaintiff alleged that prison officials needlessly "multiplied" back pain during transportation to and from hospital); *Green v. Ferdarko*, No. CV 15-45, 2017 WL 9285187 (W.D. Pa. Dec. 6, 2017), *report and recommendation adopted*, No. CV 15-45, 2018 WL 2009087 (W.D. Pa. Apr. 30, 2018) (plaintiff claimed he suffered from permanent neurologic symptoms resulting from delayed treatment of back injury); *Jamison v. Dwyer*, No. CV 16-9512 (JMV), 2017 WL 2290827 (D.N.J. May 25, 2017) (plaintiff claims failure to treat back pain resulted in permanent disability); *West v. Roberson*, No. 1:12-CV-1564, 2013 WL 2126338 (M.D. Pa. Apr. 19, 2013), *report and recommendation adopted sub nom. West v. Cnty. of York*, No. 1:12-CV-1564, 2013 WL 2126027 (M.D. Pa. May 15, 2013) (plaintiff brought claims of denial of care for back injury suffered after falling down stairs at jail); *Gayle v. Lamont*, No. CIV.A. 09-1290, 2013 WL 102660 (E.D. Pa. Jan. 9, 2013) (plaintiff's claims that he was denied treatment for back pain which prevented him from standing and bathing); *Mueller v. Ctr. Cnty.*, No. CIV.A. 3:CV-09-1880, 2009 WL 4912305 (M.D. Pa. Nov. 23, 2009) (plaintiff brought claims for denial of care for fractured vertebrae suffered while incarcerated); *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004) (reversing dismissal of plaintiff's claims that lack of proper medical care for back injury subjected him to risks of permanent disability or a fatal or serious injury).

[227] *E.g.*, *Caiby v. Haidle*, No. 3:18-CV-1120, 2022 WL 17741689 (M.D. Pa. Dec. 16, 2022) (granting PrimeCare motion to dismiss for failure to state *Monell* claim); *Weston v. Lensbower*, No. 1:19-CV-1212, 2020 WL 3830922 (M.D. Pa. July 8, 2020) (granting PrimeCare motion to dismiss where plaintiff failed to allege deliberate indifference to back pain after his back "gave out"); *Whitenight v. Elbel*, No. 2:16-CV-00646, 2019 WL 6828653 (W.D. Pa. Dec. 13, 2019) (granting summary judgment in favor of PrimeCare on basis that plaintiff had received care for back injury); *Cowher v. Pike Cnty. Corr. Facility*, No. 3:16-CV-02259, 2019 WL 3302415 (M.D. Pa. July 23, 2019) (granting PrimeCare motion for summary judgment where plaintiff received treatment for back pain); *Johnson v. PrimeCare Med.*, No. 18-CV-4651, 2019 WL 3063505 (E.D. Pa. July 11, 2019) (granting PrimeCare motion to dismiss where plaintiff failed to allege deliberate indifference to back pain); *Jubilee v. Berdanier*, No. 1:18-CV-52, 2019 WL 314719 (M.D. Pa. Jan. 24, 2019) (granting PrimeCare motion to dismiss where complaint provided that plaintiff had received medical care for back injuries on multiple occasions); *Guerrisi v. Berks Cnty. Jail Sys.*, No. CV 18-1530, 2018 WL 1831410 (E.D. Pa. Apr. 16, 2018) (granting PrimeCare motion to dismiss claims of denial of treatment for back pain where

PrimeCare's strongest argument, if it had made one, might have been that the need for medical staff to recognize and treat spinal injuries is *too* obvious, and that PrimeCare could reasonably anticipate that its medical staff—who receive extensive medical training and are subject to certain licensing requirements—possessed this knowledge without additional formal training. In *Connick v. Thompson*, the Supreme Court held that "*Canton*'s hypothesized single-incident liability does not, as a legal matter, encompass failure to train prosecutors in their *Brady* obligation."[228] The Court reasoned that, even in the absence of formal training, prosecutors are "ethically bound to know what *Brady* entails and to perform legal research when they are uncertain" and that attorneys are "equipped with the tools to find, interpret, and apply legal principles."[229]

---

plaintiff failed to plead *Monell* claim and did not name any individual defendants); *Collins v. Derose*, No. 3:CV-14-2425, 2016 WL 525475 (M.D. Pa. Feb. 8, 2016) (granting PrimeCare motion to dismiss where plaintiff failed to allege deliberate indifference); *Boynes v. Cnty. of Lawrence*, No. CV 15-139, 2015 WL 8992556 (W.D. Pa. Dec. 16, 2015) (denying PrimeCare motion to dismiss for failure to treat back pain); *Torres v. Derose*, No. 4:CV-15-1656, 2015 WL 6735906 (M.D. Pa. Nov. 4, 2015) (granting PrimeCare motion to dismiss claim for failure to treat back pain that was no more than attempt to impose *respondeat superior* liability); *Bond v. PrimeCare Med.*, No. CIV.A. 11-1046, 2011 WL 3204763 (E.D. Pa. July 27, 2011) (granting PrimeCare motion to dismiss claim for failure to treat back pain where plaintiff did not plead deliberate indifference); *Zimmerman v. Berdanier*, No. 4:07-CV-0818, 2008 WL 11503563 (M.D. Pa. Oct. 22, 2008) (granting PrimeCare motion to dismiss for failure to plead *Monell* claim, but denying motion as to individual defendants).
The Court is mindful that the existence of these cases and their underlying allegations is not proof of an epidemic of mistreated back injuries in correctional facilities within the Third Circuit. The Court merely notes that such injuries are commonplace and that the need to train medical staff accordingly is sufficiently obvious.

[228] 563 U.S. at 68.
[229] *Id.* at 67, 70.

This Court is not aware of any precedent which applies the Supreme Court's holding in *Connick* to medical professionals. One obvious distinction is that medical professionals will not always have the time to perform research or "find" the correct procedure for certain maladies. On the other hand, doctors are subject to similar ethical obligations and more extensive educational requirements. However, even if this Court were to hold that PrimeCare could reasonably rely on the credentials of certain of its medical professionals, this would not necessarily apply to the nurses that make up much of its staff.[230]

As to the non-medical staff, the Court notes that even those who are tasked with performing emergency first aid should be aware of the basics regarding stabilizing an individual suffering from a spinal injury until medical professionals arrive. However, here the only non-medical staff to observe Rossman in such a situation was Waite who, as the Court discussed above, was entitled to rely on the judgment of the medical professionals who were present. To the extent that Rossman argues that non-medical staff should have received more extensive training regarding back injuries, *i.e.*, the ability to recognize worsening symptoms, the Court

---

[230] *See Pearson*, 850 F.3d at 540 n.4 (holding that nurses are entitled to rely on the medical judgment of doctors). Applying this reasoning here, PrimeCare is less justified in relying on the credentials of its nursing staff. Extending the *Connick* analogy, nurses would be akin to paralegals in the prosecutor's office, who, to the extent that they can violate *Brady* obligations, would require relevant training. At a minimum, prosecutors would be responsible for supervising those paralegals and a failure to do so could support a *Monell* claim. Rossman has brought such claims against the medical providers here, and the Court held they were duplicative of his *Monell* claims.

is unpersuaded that such a claim could survive without, at a minimum, evidence of prior related violations.

### E.    State Law Claims

PrimeCare has not requested summary judgment on Rossman's state law claims. Instead, PrimeCare simply requests that the Court decline to exercise jurisdiction over those claims if it dismisses Rossman's constitutional claims. As the Court has not dismissed "all claims over which it has original jurisdiction," it will retain jurisdiction over Rossman's state law claims.[231] For the avoidance of doubt, the Court clarifies that this includes the state law claims against the Defendants for whom the Court has dismissed Rossman's constitutional claims. It would make little sense to require Rossman and two groups of Defendants represented by common counsel to litigate those questions in two separate forums.

The Court also notes that Rossman opted not to defend his constitutional claims against Defendants Hugar and Weaver from summary judgment.[232] In light of that choice, it seems likely that he similarly does not intend to pursue his state law claims against those Defendants. The Court will not *sua sponte* issue a judgment in favor of Hugar and Weaver on those claims as it is theoretically possible that the state law claims remain viable but respectfully encourages Rossman to dismiss those claims if he does not intend to prosecute them further.

---

[231]  28 U.S.C. § 1367(c)(3).

[232]  *Supra* n.102

## V.    CONCLUSION

For the foregoing reasons, PrimeCare's and Centre County's Motions for Summary Judgment are each granted in part and denied in part. PrimeCare's Motion is granted as to Count II, Count III as to Hugar and Weaver, Counts IV-VII, and Counts X-XI. It is denied as to Count I, Count III as to Schmidt and Lose, and Count XIII.[233] PrimeCare's request that the Court dismiss Counts XIV-XVI for lack of jurisdiction is denied as moot. Centre County's Motion is granted as to Counts VIII and X. It is denied as to Counts IX and XII. All claims against unidentified individuals are also dismissed.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[233]  Accordingly, Defendants' motion to dismiss Rossman's claim for punitive damages is also denied. *See Redclift v. Schuylkill Cnty.*, No. 4:21-CV-1866, 2022 WL 3951356 (M.D. Pa. Aug. 31, 2022) (holding that where a plaintiff has alleged a deliberate indifference claim, he has also plead a claim for punitive damages); *accord Thomas v. Luzerne Cnty. Corr. Facility*, 310 F. Supp. 2d 718 (M.D. Pa. 2004).